## No. 7855.

### Mrs. F. G. Henry vs. J. R. A. Gauthreaux et al.

It is not necessary that the Petition of a married woman, seeking the judicial authority to mortgage her property, or the Certificate of the judge issued thereon, should contain a description of the property to be mortgaged.

A married woman who, in the absence of her husband, has sought and obtained the sanction of the judge, under articles 127 and 128 of the Code, to borrow money and mortgage her property, does not need the further authorization of her husband.

The law protects the weakness of women, not their dishonesty. When a married woman has used fraudulent means to obtain a loan of money, she is estopped from pleading her incapacity, and she forfeits the benefit of the legal presumption that her contract enured to the advantage of her husband.

APPEAL from the Fifth District Court, parish of Orleans. *Rogers, J.*

Tobias Gibson for Plaintiff and Appellant.

E. J. Wenck, Sambola & Ducros, and Breaux & Hall for Defendants and Appellees.

The opinion of the Court was delivered by

BERMUDEZ, C. J.   The plaintiff has enjoined executory proceedings issued against her real estate for the payment of her mortgage note for $2500.   She prefers grave charges, both against the seizing creditors, and the notary before whom the act of mortgage was passed, and demands the annulment of her obligation, and of the security given.

She sets forth *seven* grounds of complaint, which it would be cumbersome and unprofitable to enumerate.   It is enough to say, that they are levelled against the forms of the judicial authorizations given her, in the absence of her husband, to borrow money and mortgage her estate to secure its return ; that they assail the form of the note and of the mortgage act sued upon ; that they charge want of consideration and fraudulent practices, on the part of both the notary and the seizing creditor, in procuring the note and the mortgage.

In the absence of a specific averment, connecting the seizing creditor with the ill-practices alleged, the injunction would have had to be dissolved, and the suit dismissed on the face of the papers ; 26 A. 418 ; 28 A. 232, 418, 494 ; 31 A. 834 ; but in presence of the charge which implicates the creditor, we are constrained to inquire into and determine the merits of the case.   The evidence proves conclusively the following facts :

In 1872, Frances G. Rowan, the plaintiff in injunction, was the divorced wife of Robert Baxton and transacted business before the notary named in these proceedings.   On the 9th of December, 1876, she became the wife of Arthur C. Henry.   On the 30th of December, 1876, and on the 2d of January, 1877, previous arrangements having been made through a broker for a loan of money to her, to be secured by mortgage on property of hers, the title of which was known to the notary, she appeared before him accompanied by a man, A. C. Henry, whom she introduced as a friend who had come to see that everything was "all right."   On being formally, and more than once, asked, as a matter of caution, by the notary, who had recognized her, whether her *status* had changed, in other words, whether she had *married*, since he last saw her, she answered understandingly *in the negative.*   In the acts drawn up to consummate the transaction, she represents herself as Frances G. Rowan, *unmarried.*   In the first one she acknowledges an indebtedness of $1500 ; in the second one an indebtedness of $500 ; for which she subscribes two notes, securing them by mortgage on the property.   The net proceeds of the first and second notes were applied in part to the payment of a vendor's note of hers secured on the same

property, and for what remained, were *paid* to her in the cheeks of the notary, which, upon her endorsement of the same were cashed by the bank on which drawn. The two acts were signed by A. C. Henry as an attesting witness. On being afterwards detected and rebuked, she promised to pay her debts. On the 21st July, following, the plaintiff in injunction presented a petition, *sworn* to by her, to a district judge in this city, averring the absence of her husband from the State, a desire to borrow $2500 to pay a mortgage debt encumbering her estate, and to make repairs to the buildings upon it, and to secure the loan by mortgage on her property, and concluding with a prayer for authority to do so. The judge, on the same day, made a special order on her petition, authorizing her to act as prayed for. He issued to her, besides, a certificate in the printed form usually adopted for such purposes, showing that he had examined her touching the objects for which she intended making the loan, and that she proposed doing so for her exclusive advantage. He, therefore, authorized her to borrow the amount and to secure the same by mortgage on her property under the provisions of the act of 1855, now incorporated in the R. C. C. as articles 126, 127, 128.

With this petiton, order and certificate in hand, she appeared, on the same day, before the same notary, acknowledged an indebtedness of $2500, for which she issued her note, securing it by mortgage on her real estate. The act says and the evidence proves, that the two notes previously issued by her, one for $1500 and another for $500, were produced by the original mortgagee, and canceled, AS PAID. The difference between the total amount of those two notes, and the face of that last one issued, less discount and charges, was paid to her, and was by her used to redeem some jewelry of hers which had been pawned out of the State.

The note of $2500 became the property of Mrs. Mioton, the seizing creditor. At its maturity, upon payment of interest, the drawer was allowed further time. The note was subsequently again renewed by consent; owing to non-payment, it was finally put in suit and steps were taken for a foreclosure of the mortgage.

The *three* first grounds of complaint of the plaintiff in injunction repeat themselves. They attack the forms of the petition, order, certificate, note and mortgage sued on, and are easily met.

It has never been deemed, and it is not, necessary that the petition of a married woman, seeking authority to borrow money and to mortgage her property to secure its return, or that the certificate of examination of the District Judge, to whom she applies, should contain a description of the property to be encumbered. The object of the law, in providing for her examination by the Judge, *at chambers*, separate from her husband, was not to enable him to ascertain the description of

such property, but the character of the contemplated loan, the purposes to which, if effected, it would be applied, and to determine whether or not it would enure to her *exclusive* benefit. A married woman may obtain such certificate and may merely contract the debt, without giving any mortgage. When such security is required by the lender, and is to be furnished, the law says that the certificate shall be *authority* for the mortgage.

It is true, that the printed certificate issued in this case to plaintiff, contains the authority to borrow and mortgage "*with the authorization of her husband.*" Those words should have been erased. They were left in by an over-sight, and must be considered as unwritten. How can it be claimed that such authorization was made a condition *sine quâ non,* when it appears that a minute before, the plaintiff alleging the absence of her husband from the State, was asking to be, and was, actually authorized by the judge, to borrow and mortgage. The petition, order and certificate were issued simultaneously.

They cannot be treated as destructive, the one of the other, and must be dealt with as a consistent proceeding intended for a practical object.

In order to justify the judge in giving the special authority asked in the petition, it was unneccessary to cite the husband, who had not been represented by the wife, as *refusing* his authority, and who had been alleged by her as being beyond the jurisdiction and reach of the court. R. C. C. 124, 125.

The complaint that the note and mortgage sued on were made without the authorization of the husband is therefore groundless. The authority of the judge, on the petition and in the certificate, stands in place of the husband's and is certainly more efficacious.

The *four* remaining grounds of complaint cannot afford the plaintiff in injunction any relief.

She charges : want of consideration for the note sued on, and recourse to fraudulent practices by the notary and by the suing creditor in the procurement of that note and of the mortgage securing it.

In order to establish such want of consideration, the burden being on her to do so, as she had been authorized by the judge, after examination, to borrow and mortgage, she contends that the two notes first issued, and which are represented by the note sued on, are nullities, because they were not made with the authorization of her husband ; because they were issued under threats of violence on his part ; because the proceeds of the same were never received by her, but by her husband, and never enured to her benefit.

It is indisputable that the two notes referred to were issued by the plaintiff in the capacity of a *single* woman, she representing herself ex-

pressly in the act of mortgage as an *unmarried* person ; that the net proceeds were applied, in part, to the payment of a vendor's note of hers, secured on the property mortgaged and, for the balance, were *paid* to her, as already said. It is, therefore, palpable, that the plaintiff, while a married person, *twice* falsely represented herself as *feme sole* and, upon such fraudulent practice, obtained from a third party the loan of sums of money, which were paid to her.

It is *true* that the notes were issued by her without the *formal* authorization of her husband, but it is *false* that they were made without his knowledge, for it is well proved that he signed the two acts of mortgage given to secure them.

The question which arises, under the circumstances of this case, therefore, is :   Whether a married woman, who represents herself as *feme sole*, and who, on offering inducements, procures money from an innocent party, can be permitted, so as to prejudice such party, to repudiate her conduct, charge the nullity of her acts, and obtain from courts of justice a release from all the obligations so contracted.

We think that in such cases the doors of the temple of Justice are closed to her, and that she must be left an outsider, in the circumstances in which her villany has placed her.

Before going further, we desire to disentangle the case from apparent embarrassments, which present themselves at the very threshold of the legal investigation upon which we are about to enter.

While we notice that the acts of mortgage were signed by the husband as a witness, and consider that, in ordinary circumstances, this would be deemed a sufficient, though informal authorization to the wife, we will, as their relations were *then* unknown to the mortgagee, let them remain in the shameful condition in which they have conspired to place themselves, and will deal with this case as being that of a married woman fraudulently representing herself as a *single person* and obtaining money under such false pretense.

We will leave out of view the inconsistent charge of threats of violence, marital pressure and coercion, made by the plaintiff, the more so, as the only evidence offered to substantiate this ground of complaint is that of the plaintiff herself, unsupported, in any respect, by any corroborating testimony. It is so weak, so open to suspicion, so unpalatable, that it is not entitled to the least weight, particularly as nothing shows that the mortgage creditor had any knowledge of the facts of marriage and threats charged. Indeed, how could that creditor have been aware of such condition of things, when he knew neither the wife nor the husband, and thought that he was transacting business with a person who was unmarried, and whom he had never before seen. 22 A. 32 ; 25 A. 595 ; 26 A. 418 ; 28 A. 418 ; 31 A. 832 ; O. B. 45 f. 407 ; R. C. C. 1589, 1847, 1850, 1853.

Proceeding now to consider the question stated and the answer which we have made to it, we propose, owing to the importance of the matter, to state more extensively than we would have done otherwise, our full views in relation to it, that it may be hereafter considered as having been fully investigated and thereupon set at rest.

Unless the plaintiff be so estopped, the creditor would have to show that the proceeds of the notes enured to her benefit.

It has for a long while been, and it still is, the law and the jurisprudence of Louisiana, that persons who deal with married women, in a pecuniary point of view, do so at their risk and peril, and cannot enforce a money claim against them without proving that it has enured to their benefit, and this, whether the wife was authorized by the husband or by the court, in his absence or on his refusal. When so saying, we leave out of view the case of a judicial authorization granted, under the act of 1855, and embodied in the R. C. C., arts. 126, 127, 128, and ignore presently that legislation.

The law and the jurisprudence in this State have uniformly accorded to married women an exceptional protection never extended to minors. Proof of the mere payment to a married woman of a sum of money lent her has not been deemed sufficient to establish that it has enured to her advantage. Something more has always been required of the creditor. He has always been held to show that the money borrowed had actually been applied to her benefit, and, unless satisfactory proof was made of that fact, he invariably failed in his attempt after recovery. Minors have never been as effectually shielded. Where judicial authority has been granted to a tutor, with the advice of a family meeting, concurred in by the under-tutor, to borrow money in the name of the minor, and to secure the debt by mortgage, and the money was loaned, and the security was given, the lender, suing in case of non-payment, has never been constrained to prove that the loan had enured to the benefit of the minor. But it has never been, and it is not the law and jurisprudence of Louisiana, that the incapacity of the wife to contract is universal and absolute; that the limitations placed upon her ability, in order to maintain the marital power, or to protect her against its abuse, are to be extended to all the cases of covenant which persons of ordinary competency can form.

Women are not incapacitated on account of their sex. The capacity of single women of age is co-extensive with that of men. In the event of marriage, their incapacity is limited to certain instances. The restrictions thus placed upon their powers necessarily must be strictly construed, and will not be extended to cases within which marriage does not bring them. Hellwig vs. West, 2 A. 2 ; Zunts vs. Moussier, 10 A. 433.

While the law and the jurisprudence have, at all times, favored

married women in the assertion and vindication of their rights, they have never intended, and do not contemplate, to protect them in the perpetration of fraudulent practices for the accomplishment of villainous objects, by which to enrich themselves gratuitously at the expense of their unguarded and trusting neighbor, on whom equity keeps a watchful eye. R. C. C., 1965. Protection, in the consummation of such offenses, would be a heinous crime, denounced by the well-recognized, fundamental principles of religion and morality, by which men, living in society, have always been guided and ruled.

Under the remarkable system of civil law which exists in this State, and in which both law and equity are admirably blended, married women, who have become guilty of fraudulent representations to obtain money, should be held as insuperably *estopped* from repudiating their conduct, sanctifying their wrongful deeds and from exonerating themselves from responsibility towards *bona fide* creditors.

Courts of justice actuated by a sense of their duties and responsibilities, cannot sanction such scandalous and outrageous spoliations, without endorsing their immorality and iniquity and forfeiting the sacred trust and confidence reposed in them.

The protection with which married women are surrounded in this State, derives from the Greek, the Roman, the Spanish and the French laws. Although extended to them in all proper cases, it must be unhesitatingly refused when justice imperiously requires that it should be declined.

As laid down in the Greek and the Roman law, the rule is, that when a fraud has been committed by a married woman she will be denied the benefit of the *senatus consultum*, which was intended to protect only such women when they have been deceived, and not at all to shield those who have willfully practiced artful deceptions on others.

*Sed ita demum eis subvenit,* says Ulpian, *si non callide sint versatœ. Hoc enim Divus Pius et Severus rescripserunt. Nam deceptis, non decipientibus, opitulatur. Et est et grœcum severi (tale) rescriptum.* * * * * * * * * *id est: Decipientibus mulieribus senatus consultum auxilio non est. Infirmitas enim fœminarum, non calliditas auxilium demit.* Dig. L. 16, T. 1, l. 2, par. 3 ; ditto ; l. 11, 12, 13.

The Spanish law provides that a woman can be held responsible when she clothes herself in the apparel of a man or practices some other fraud by which she is taken as security by one who believes her to be a man ; for the rights which women enjoy with respect to suretyship, are not granted to enable them to practice fraud, but on account of their natural inexperience (simplicitas) and feebleness.

" La sexta (razon) es quando la muger, se vestiese vestiduras de

varon enganosamiento, o'feciese otro engano qualquier, porque la resce-
biese alguno por fiador cuidando que era varon ; ca el derecho que han
las mugeres por si, en razon de las fiaduras non les fue otorgado par
ayurdarse del en el engano, mas por la simplicidad et por la flaqueza.
que han naturalmiente." V. Part. tit. XII, 1. III.

Under the French system, where a married woman ·resorts to
fraudulent practices to procure money she is not permitted to gainsay
her doings and to claim a release from liability :

" En principe et aux termes de l'art. 217, (say the learned jurists who '
have compiled the Mémoire de Jurisprudence, published in Toulouse,.
vol. 6, p. 388.) toutes les obligations contractées par les femmes mariées
sans l'autorisation ou le consentment de leurs maris, sont nulles ; mais
il serait injuste de prétendre que cette disposition qui n'a été portée
que dans l'intérêt des femmes, pût leur fournir l'occasion, ou le prétexte
de tromper impunément les tiers—*Mulieribus subvenitur, ad hoc ne·
decipiantur, non vero habeant occasionem decipiendi.* L. 110, §4. ff. de
Reg. Jur. Le senatus consulte Velléïen qui autorisa les femmes à se
faire relever des obligations qu'elles auraient contractées pour autrui,
statua qu'elles ne pourraient point invoquer le bénéfice de la restitution,
si le créancier prouvait qu'il avait été trompé. V. l. 2 §2, 3 and 3 ff. ad '
Senat. Cons. Vell. 5 et 18 C. eod. tit. Ainsi une femme mariée, qui vit
séparée de son mari depuis plusieurs années, qui passe.publiquement
pour veuve, qui accrédite cette opinion en prenant cette qualité dans
des actes publiques et cache frauduleusement sa qualité de femme mariée,
en contractant ainsi, contracte une obligation : quoique nulle en elle
même, cette obligation ne doit pas moins avoir son effet, parceque le
délit qu'elle a commis en prenant une fausse qualité pour tromper le
préteur n'est pas moins. punissable quoiqu'elle soit mariée et cette
femme ayant contracté par là, des suites de son délit, cette indemnité
ne peut être moindre que le montant de l'obligation qu'elle a souscrite.
La demande en nullité d'une pareille obligation, peut d'ailleurs être
repoussée par d'autres principes. L'erreur commune a le privilége de
constater un droit. *Error communis facit jus.* Ce principe est consacré
par la loi   *   *   *   et adopté par la jurisprudence française.

See Merlin, Vo. Autorisation Maritale, sec. 7, Nos. 4, 19.

Toullier, Droit Civil, T. 2, Nos. 622, 623.

Pothier, Puissance Maritale, Nos. 28, 53.

La femme mariée qui est convaincue d'avoir commis le dol, ou d'y·
avoir participé, ne trouve dans les lois aucun moyen d'impunité.   *   *   *
Cette dissimulation ne fait qu'aggraver le dol qu'elle a commis. Elle
doit succomber à toutes les condamnations qu'elle a encourues.

Chardon, Dol, vol. 1, p. 74, No. 48.

La loi en plaçant la femme sous le protectorat de son mari, n'a pas.

entendu lui assurer l'impunité de ses mauvaises actions.    Elle l'oblige à en réparer les effets.    La femme qui parvient à contracter avec une personne qui ne la connait pas, en la trompant sur son état, se rend coupable de faux, ou au moins, d'escroquerie, et toutes les obligations que le contrat lui impose sont aussi exécutoires sur sa fortune personnelle que si elle avait été autorisée par son mari.    *    *    *    La validité des engagements de cette femme est universellement reconnue, et la doctrine des auteurs sur ce point de droit a été confirmée par de nombreux arrêts.

Chardon, Trois Puissances, vol. 1, p. 139, Nos. 85, 87, 88 ; see, also, Vazeille 2, 313 ; Duranton 2, 463 ; Delvincourt, 1, 334 ; Fremy, Dic. de Proc. Fem. Mar. No. 70 ; J. P. 1809, p. 321 ; J. P. 1808, p. 121.

Un mariage valablement contracté, mais tenu secret, ne peut être opposé aux tiers qui l'on ignoré, et une donation contractuelle faite par la femme a un tiers, ne peut être annullée par défaut d'autorisation maritale.    J. P. Agen, 1822, p. 670 ; J. P. Grenoble, 1822, p. 760.

Une femme mariée qui a pris dans les actes la qualité de veuve, tandis qu'elle connaissait l'existence de son mari, et qui est parvenue à l'aide de cette fausse qualité, et par dol, à se faire prêter certaines sommes, ne peut attaquer de nullité les obligations qu'elle a souscrites, sous le prétexte du défaut d'autorisation maritale.

J. P. Cassation, 1824, p. 790.

It is not to be forgotten that the debt evidenced by the note for $2500 and secured by the mortgage last given, was contracted under representations made by the plaintiff in injunction, in a petition, the verity of which she has attested under *oath*, during the absence of her husband from the State, and the *judicial* authority of a District Judge under the provisions of Art. R. C. C. 126, 127, 128.

That judicial authority, when once obtained, is fully protective of parties dealing with married women and not proved to have been guilty of fraudulent practices.

By reference to articles R. C. C. 2357 *et seq.*, it will be seen that immovables settled, as a dowry, can be alienated or mortgaged during marriage, with judicial authorization.    The articles on the same subject-matter, are articles 1557 *et seq.* of the Napoleon Code, which have often been the subject of critical examination both by commentators and by courts of justice.    Commenting upon them, Troplong says :

"Quand même il serait articulé et prouvé que les époux ont agi entre eux frauduleusment, si le tiers qui a acheté, ou prêté son argent, est de bonne foi, tout doit être maintenu à son égard.    Il a traité sous la garantie des formes judiciaries; il ne saurait être victime de simulations qui lui sont étrangères.    C'est ce que la Cour de Cassation a très bien jugé (17 Mars, 1847,) dans une espèce, où les epoux s'étaient entendus

avec un ami complaisant pour simuler des dettes et faire mettre le mari en prison et où, grâce à cette fraude, ils avaient obtenu du tribunal une autorisation d'emprunter pour faire cesser l'incarcération. Un tiers étranger à ces manœuvres s'était présenté pour traiter sur la foi de ce jugement et avait fait le prêt. Plus tard la femme conçut l'idée de se dégager de ses obligations sans bourse délier ; elle allégua les circonstances par lesquelles on avait surpris la religion de la justice, par de vaines apparences. La Cour de Paris, sans vouloir examiner sa bonne foi, annula les actes intervenues, en se fondant sur la simulation machiavélique pratiquée pour porter atteinte à l'inaliénabilité dotale. Mais par l'arrêt de la Chambre Civile, cette décision a été cassée, et c'est avec raison que la Cour de Cassation a arrêté dans sa naissance, cette jurisprudence funeste. *Il n'y aurait plus eu moyen de traiter avec des époux dotaux, même sous l'égide des décisions judiciaires.*

Troplong, Cont. Mar. 4, Nos. 3499, 3438, 3329, Cass. 1 Août, 1842 ; Dalloz 42, 1, 325.

Lorsque des tiers ont contracté avec la femme mariée sur la foi d'une autorisation accordée par justice, la femme n'est plus recevable à quereller son engagement, sous prétexte que l'autorisation serait contraire à la loi.

Grenoble, 9 Nov., 1839 ; id. 14 Juin, 1841 ; Toullier, T. 5, p. 310 ; S. V. 40, 2, 209 ; D. 40, 2, 157 ; S. V. 41, 2, 612 ; D. 41, 255 ; J. P. 41, 2, 613.

Lorsque l'autorisation d'aliéner un immeuble dotal a été accordée dans l'un des cas prévus par la loi, et que toutes les formalités voulues ont été remplies, l'acquéreur de l'immeuble est à l'abri de toute recherche. *On ne peut prétendre contre lui que les faits allégués pour motive l'aliénation n'étaient pas vrais.* Caen, 12 Juin, 1842 ; S. V. 42, 2, 462. La vente doit être considérée comme inattaquable. Paris, 26 Fev. 1833 ; S. V. 33, 2, 230 ; D. 33, 2, 144.

" A nos yeux, les engagements contractés par la femme, en vertu du jugement lui accordant l'autorisation d'aliéner, même hors des cas déterminés par la loi, sont pleinement valables, et tout aussi obligatoires pour elle, que si l'autorisation avait été légalement accordée. *Les tiers ne doivent pas avoir à souffrir de l'erreur des juges.* Si l'on admettait un système contraire, on irait contre l'intérêt des femmes ellesmêmes, car jamais elles ne trouveraient des personnes qui voulussent alors contracter avec elles dans les cas prévus, à raison du danger possible de l'annulation ultérieure de leur contrat."

Gilbert, Code Annoté, art. 1558, Nos. 7, 10, 50, 53, 54, 55.

Our own jurisprudence, since the passage of the act of 1855, is to the same effect.

The law as it stood previous to that year in regard to married women remains unimpaired, with the difference that a married woman

taking the benefit of that act is *placed* in the position of a *feme sole*, her contract furnishing full proof against her; while under the general jurisprudence those who deal with a married woman are bound to see that the contract made enures to her benefit.

Rice vs. Alexander, 15 A. 54.

The holders of a debt contracted by a married woman, with the authorization of the District Judge, according to the act of 1855, is not bound to prove that the consideration thereof enured to her benefit. The burden is on her.

The effect of the law and the certificate issued under it, is to dispense the creditor, by an observance of its formalities, from the obligation which would otherwise exist of proving that the money advanced by him was actually applied to the benefit of the wife, otherwise such creditors trusting to judicial action, would be exposed to fall into snares and pitfalls.

Miller vs. Wisner, 22 A. 457.

Brooks vs. Stewart, 26 A. 714.

Feltus vs. Blandin, 26 A. 402.

City National Bank vs. Barrow, 21 A. 390.

Knight vs. Mentz, 23 A. 538.   Succession of Hébrard, 18 A. 485, 494.

Reich vs. Rosselin, 24 A. 418 ; Rainey vs. Asher, 26 A. 262 ; Gay & Co. vs. Deynoodt, 27 A. 249 ; Lock vs. Lafitte, 28 A. 232 ; Taylor vs. Bowles, 28 A. 295 ; Pilcher vs. Pugh, 28 A. 495 ; Hollingsworth vs. Spanier, 32 A. 203.

In the case of Bein vs. Heath, 6 H. 228, the Supreme Court of the United States said, that if a party has loaned money to a married woman in Louisiana, and has been induced by her representatives, and those of her husband, to believe that the money loaned was for the sole benefit of the wife, the latter will be bound, though the money was in part borrowed for the husband, and used by him, and whatever be the law of Louisiana in this particular, a wife can obtain no relief in chancery against such a contract. It is a principle of chancery that one who asks relief must have acted in good faith.

However respectfully we submit to the ruling of that exalted tribunal, under the circumstances of the case in which it was made, we do not consider that it is binding upon the State tribunals, in the administration of justice, in those cases in which married women have not been examined and authorized, under the act of 1855, but we think that the principle which it expounds may be extended to those cases in which, as in the present one, such examination has taken place, and such authority has been given her, when third parties making the loan are *in good faith*, and are not charged with, and convicted of, knowledge and commission of ill-practices.

In some instances married women are also estopped at common law when guilty of fraudulent representations. Bigelow on Estop., 443, 445, and notes.

Enlightened by the authorities which we have taken pains to examine and quote with precision, we come to the conclusion that the plaintiff in injunction is absolutely *estopped* from contesting her liability for the two notes of $1500 and $500 first issued by her, for which she would be bound, even under the law as it stood prior to 1855, and that the seizing creditor cannot, therefore, be held to prove that the consideration of those two notes has enured to her benefit.

The proceeds of the note of $2500 sued on having been applied to the retirement of those two notes, the plaintiff in injunction has, therefore, to that extent, received a valid consideration for that note. 31 A. 834, O'Keefe vs. Handy.

In respect to the difference, it is sufficient to state that the evidence shows that she received it and applied it to the redemption of articles of jewelry of hers, pawned out of the State, and which must have been deemed of more value than the sum invested to redeem them. But, had it not been the case, the plaintiff could not have defeated the claim of the seizing creditor, who is relieved from the obligation of proving that money enured to her benefit, as she had been authorized by the judge to contract the loan and the burden was on her, and as he did not know and could not have known that the proceeds were to be, even if they were so, improperly applied by her.

The plaintiff in injunction cannot claim that the rate of discount was usurious. By placing herself under the operation of the Act of 1855, R. C. C. 126, 127, 128, she has assumed the attitude of a *feme sole,* capable of incurring all the obligations to which men of legal competency can validly subject themselves. Under the provisions of the act of 1855, p. 352, incorporated in the R. C. C. as Art. No. 2924, the discounter of any note has the right to claim and recover the *full* amount of such note, with interest, notwithstanding the rate of discount has been beyond the rate of eight per cent per annum.

The decision in Hollingsworth vs. Spanier, 32 A. 303, which is to the effect that the authorization given by the judge to a married woman under the Act of 1855 does not imply the power to contract for usurious interest, although applicable to this case in many respects, has no bearing upon it in that regard. The grave charges preferred are without foundation. Both the notary and the seizing creditor are relieved from reflection in the premises.

The defendant in injunction has prayed for damages in her answer to the suit and to the appeal. As the act of mortgage provides for the payment by the plaintiff of the fees of the attorney suing to recover

·the debt, and as the plaintiff may be entitled to mercy, we do not feel ourselves authorized to grant any damages.

We have looked at the decretal part of the judgment of the lower court. It is not couched in the language in which it should have been. Considering that it cannot mean a *nonsuit*, but is intended to *dissolve* the injunction and to *reject* the demand of plaintiff with judgment in favor of the defendant in injunction, and placing that construction ·upon it,

It is affirmed with costs.